(305 P.3d 13)
No. 107,666

WICHITA TERMINAL ASSOCIATION, BURLINGTON NORTHERN & SANTA FE RAILWAY COMPANY, and UNION PACIFIC RAILROAD COMPANY, *Appellants*, v. F.Y.G. INVESTMENTS, INC., and TREATCO, INC., *Appellees*.

Opinion filed May 31, 2013. Modified opinion filed July 2, 2013.

*Jeffrey R. King,* of Lathrop & Gage LLP, of Overland Park, and *K. Paul Day* and *Doug Dalgelish,* of the same firm, of Kansas City, Missouri, for appellants.

*James D. Oliver,* of Foulston Siefkin LLP, of Overland Park, and *Wyatt A. Hoch,* of the same firm, of Wichita, for appellees.

Before PIERRON, P.J., BRUNS and POWELL, JJ.

BRUNS, J.: This is the third appeal in a dispute over access to real property. The Wichita Terminal Association, Burlington Northern & Santa Fe Railway Company, and Union Pacific Railroad (collectively WTA) own and operate railroad tracks in Wichita. F.Y.G. Investments, Inc., and Treatco, Inc. (collectively FYG) own real property adjacent to the WTA's tracks. In 2008, the WTA was ordered to provide access—by way of a permanent railroad crossing—from a public street to FYG's real property.

In the present appeal, although the WTA does not dispute the district court's authority to require it to install a permanent railroad crossing to provide access to FYG's property, it contends that federal law preempts state courts from requiring interstate rail carriers to remove or reconstruct existing tracks in order to install a permanent railroad crossing. Specifically, the WTA argues that provisions of the Interstate Commerce Commission Termination Act

(ICCTA), 49 U.S.C. 10101 *et seq.* (2006), preempted the remedies ordered by the district court in a journal entry filed on January 25, 2012. Because we find that federal preemption is applicable to some of the remedies ordered by the district court, we affirm in part, vacate in part, and remand with directions.

## FACTS

Wichita City Ordinance No. 5436—which was enacted in 1916—grants the WTA the right to construct, operate, and maintain railroad tracks along 25th Street in Wichita. Pursuant to the ordinance, the WTA continues to own and operate two sets of parallel railroad tracks that run within a 30-foot right-of-way located south of 25th Street. Burlington Northern & Santa Fe and Union Pacific use the tracks as an interchange to move rail traffic between their rail lines. In addition, they temporarily store railcars on the tracks to facilitate the interchange of rail traffic.

In 1996, FYG purchased approximately 27 acres of undeveloped land directly to the south of the WTA's railroad tracks. After the WTA began repairing its railroad tracks in September 2002, FYG claimed that the WTA was a trespasser. Thereafter, on November 6, 2002, the WTA initiated this action, seeking to enjoin FYG from interfering with its right to maintain the railroad tracks. In response, FYG filed a counterclaim requesting an easement to allow vehicles to cross the WTA's tracks in order to access its property from 25th Street.

The district court granted summary judgment in favor of the WTA on January 7, 2004, finding that FYG had no legal right to ingress and egress across the WTA's railroad right-of-way. The district court also found that the city ordinance gave the WTA the right to construct, operate, and maintain railroad tracks along 25th Street. On appeal, a panel of this court reversed the district court's ruling and remanded the case to the district court "to determine if an injunction to provide ingress and egress [was] appropriate." See *Wichita Terminal Association v. F.Y.G. Investments, Inc.*, No. 92;132, 2005 WL 824042, *4 (Kan. App. 2005) (unpublished opinion) (*Wichita Terminal Association I*).

On February 20, 2007, the district court held an evidentiary hearing on remand. After hearing the testimony of several witnesses, the district court announced its decision on the record. The district court found that 25th Street—although undeveloped—is a public street and that the city ordinance required the WTA to provide ingress and egress over its railroad tracks to FYG's real property. In addition, the district court announced that it was entering a mandatory injunction requiring the WTA to construct and install a permanent railroad crossing and, in the interim, to keep a temporary crossing open to provide access to FYG's land adjacent to the railroad tracks. Following the hearing, the district court filed a minute order and directed FYG's attorney to prepare a journal entry.

Because the parties could not agree on the terms of the journal entry, one was not filed until August 1, 2008. In the journal entry, the district court ordered the WTA to:

"construct and install, within 90 days after [FYG's] presentation to [the WTA] of sealed engineering drawings . . . , (i) a permanent railroad crossing at least 32 feet in width at the point where the centerline of the dedicated Emporia Court street intersects with the railroad tracks, and (ii) permanent railroad crossing protection in compliance with Federal Railroad Administration requirements."

No appeal was filed from this journal entry, and it became a final order of the district court.

On December 18, 2008, FYG presented the WTA with a set of engineering drawings approved by the City of Wichita for the construction of a permanent railroad crossing at Emporia Court. Under the terms of the journal entry, the WTA was obligated to complete a permanent railroad crossing at Emporia Court by March 22, 2009. Because work on the project had not commenced as of April 2, 2009, FYG filed a motion for order to appear and show cause. The motion requested that the court hold the WTA in contempt for failing to begin work on the Emporia Court crossing and for failing to keep the temporary crossing open as required by the journal entry filed on August 1, 2008.

In response, the WTA moved for relief from judgment under K.S.A. 60-260(b). In the motion, the WTA argued that the installation of a permanent railroad crossing at the Emporia Court lo-

cation would be impractical, if not impossible, because the place-ment of crossing protection devices would impede the public right-of-way on 25th Street and would violate the Manual on Uniform Traffic Control Devices (MUTCD). Moreover, in its response to FYG's contempt motion, the WTA also argued that the Surface Transportation Board (STB) had express or implied jurisdiction to review the matter under the ICCTA because a railroad crossing at Emporia Court would have a substantial impact on interstate commerce.

On June 9, 2009, a different district judge conducted an evidentiary hearing to consider both FYG's contempt motion and the WTA's K.S.A. 60-260(b) motion. At the hearing, the judge questioned an employee of Burlington Northern & Santa Fe regarding whether the WTA could construct the Emporia Court crossing in compliance with the MUTCD if it removed the north track to allow more room for the placement of crossing protection devices. The judge also questioned the employee regarding whether the WTA could install an underpass or overpass at Emporia Court.

At the conclusion of the hearing, the district court granted the WTA's K.S.A. 60-260(b) motion and denied FYG's contempt motion. Specifically, the district court found that "the installation of traffic protection for a crossing over two tracks at Emporia Court is practically impossible . . . without impeding traffic on the un-improved 25th Street." Hence, the district court concluded that the WTA had shown good cause for failing to timely construct and install a permanent crossing at Emporia Court. The district court, however, rejected the WTA's suggestion that the permanent crossing be placed at the location of the temporary crossing because no appeal was taken from the journal entry filed on August 1, 2008.

In a journal entry entered on July 20, 2009, the district court ordered the WTA:

"to construct and install (i) a permanent railroad crossing at least 32 feet in width at the point where the centerline of the dedicated Emporia Court Street intersects the railroad tracks, and (ii) permanent railroad crossing protection in compliance with all federal, state, and local laws, regulations, and ordinances. This crossing shall not impede in any manner in the public right-of-way of 25th Street. [The

WTA] must remove the north track in the area of the crossing if that is the only means to construct the crossing and crossing protection without impeding 25th Street. . . . [The WTA] must construct the crossing and crossing protection within 90 days after the entry of [this] Journal Entry. . . . All other provisions of the August 1, 2008 Journal Entry . . . will remain in effect."

On the same day the journal entry was filed, the WTA filed an objection to the proposed journal entry, arguing that it contained inaccurate statements and failed to remedy the problems with the August 2008 journal entry. Further, the WTA argued that the district court exceeded its jurisdiction and authority because the removal of railroad tracks falls under the exclusive jurisdiction of the ICCTA. The WTA also argued that because of its substantial impact on interstate commerce, the ICCTA impliedly preempted an order requiring removal of the north track. In addition, the WTA argued that even if the north track were removed, compliance with the MUTCD was not possible without placing crossing protection devices that would impede 25th Street. The WTA also requested that the action be stayed so that it could "pursue appropriate authorizations from the STB before proceeding any further with any proposed scenario that would require interference with the existing tracks." It appears from a review of the record that the court never ruled upon the objection or the request for stay.

In the second appeal, a panel of this court affirmed the district court's granting of the WTA's K.S.A. 60-260(b) motion "based on the impossibility of the remedy ordered" in the journal entry filed on August 1, 2008. But the panel reversed that portion of the district court's ruling in which it "sua sponte required a remedy [of removal of a railroad track] that was neither proposed by the parties nor supported by the evidence." Accordingly, the case was again remanded to the district court to "give both parties a limited time period in which to propose and address the options for viably implementing the injunction in compliance with the MUTCD, including but not limited to removal of the north track at Emporia Court and/or any other legally compliant crossing." Although the panel mentioned the issue of federal preemption, it did not reach the issue in its opinion. *Wichita Terminal Association v. F.Y.G. Investments, Inc.*, No. 103,015, 2011 WL 588505, at *11 (Kan.

App. 2011) (unpublished opinion) (*Wichita Terminal Association II*).

Following the second remand, the original district judge held an evidentiary hearing. Following the hearing, the district court entered a journal entry filed on January 25, 2012, finding that "the most viable option for providing access to F.Y.G.'s real property is removal of the north track coupled with the laying of a new track south of the existing tracks." Moreover, the district court found "that removal of the north track would allow the Emporia Court location to be built in compliance with the MUTCD." Based on these findings, the district court ordered that the WTA must "complete construction of the permanent crossing [at Emporia Court] by April 1, 2012." In the interim, the district court required the WTA to "keep open the temporary timber crossing at the northwest corner of F.Y.G.'s property . . . to provide ingress and egress from 25th Street to F.Y.G.'s property." Once again, the issue of federal preemption was not decided.

Subsequently, the WTA filed a timely notice of appeal.

## ANALYSIS

### *Contentions of the Parties*

In the present appeal, the WTA contends that the ICCTA preempted the remedies ordered by the district court on January 25, 2012. Specifically, the WTA argues that the ICCTA places the construction and removal of railroad track under the exclusive jurisdiction the STB. Moreover, the WTA contends that the remedies imposed by the district court unreasonably burden interstate commerce. The WTA, however, does not challenge the district court's jurisdiction to require it to provide access to FYG's real property from the adjacent public street.

In response, FYG makes three arguments. First, FYG contends that the WTA did not timely raise federal preemption as a defense. Second, FYG argues that even if the issue of federal preemption was raised in a timely manner, it is not a justification for the WTA to deny FYG's previously determined right of access to a public street. Third, FYG contends that the district court's order was reasonable because the Emporia Court location is the most viable

option for a permanent railroad crossing and that the crossing can be constructed in compliance with the MUTCD.

*Federal Preemption of State Law*

The Supremacy Clause of Article VI of the United States Constitution establishes the doctrine of federal preemption:

"This Constitution and the Laws of the United States which shall be made in Pursuance thereof, . . . shall be the supreme law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

"Simply put, the Supremacy Clause invalidates state laws that interfere with, or are contrary to, federal law." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011). In determining whether federal preemption is applicable in a given case, we must look to "the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996). Accordingly, because federal preemption involves an interpretation of law, our review is unlimited. See *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 974-75, 218 P.3d 400 (2009); see also *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, Syl. ¶ 18, 296 P.3d 1106 (2013).

The Kansas Supreme Court has identified several categories and subcategories of federal preemption:

"Broadly speaking, a preemption analysis divides into two principal categories: express and implied preemption. Implied preemption is further divided into two analytical subcategories: field preemption and conflict preemption. Then, yet a third strata of analytical subcategories is used when examining claims of conflict preemption: per se conflict and obstacle preemption. [Citations omitted.] Even though it is analytically helpful to consider the relationship of these categories, it must be remembered that these analytical categories are not 'rigidly distinct.' *English*, 496 U.S. at 79 n.5. For example, 'field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.' *English*, 496 U.S. at 79 n.5." *Board of Miami County Comm'rs*, 292 Kan. at 294-95.

Express preemption is applicable "when Congress makes its intent known through explicit statutory language." 292 Kan. at 295 (citing *English*, 496 U.S. at 79). On the other hand, implied preemption is applicable "when Congress does not expressly preempt state law, but its intent to do so can be inferred from a statutory or regulatory scheme." 292 Kan. at 296 (citing *English*, 496 U.S. at 79). Thus, federal preemption is ultimately a question of congressional intent. See *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992).

In the present appeal, the WTA argues both express and implied preemption. Although the WTA asserts that the ICCTA expressly preempts state law regarding the removal and reconstruction of railroad tracks, it concedes that federal law does not expressly preempt the resolution of railroad crossing disputes by state courts. Nevertheless, it argues the congressional intent to preempt state courts from entering orders that would place an unreasonable burden on interstate commerce can be inferred from the language of the ICCTA.

*Interstate Commerce Commission Termination Act*

Congress enacted the ICCTA in 1995. The ICCTA abolished the Interstate Commerce Commission (ICC) and created the STB to regulate rail transportation in the United States. 49 U.S.C. § 10501(a)(1) (2006). Prior to the adoption of the ICCTA, there was confusion regarding the roles of federal and state governments to regulate railroads. Hence, the ICCTA was enacted "to reflect the direct and complete preemption of state economic regulation of railroads." H.R. Rep. 104-311, at 95-96 (1995).

The ICCTA provides that the jurisdiction of the STB over:

"(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, *is exclusive.*" (Emphasis added.) 49 U.S.C. § 10501(b).

Furthermore, the ICCTA contains an *express* preemption provision, which states:

"Except as otherwise provided in this part, the *remedies provided* under this part with respect to regulation of rail transportation *are exclusive and preempt* the remedies provided under Federal or State law." (Emphasis added.) 49 U.S.C. § 10501(b).

Accordingly, "congressional intent is clear, and the preemption of rail activity is a valid exercise of congressional power under the Commerce Clause." *City of Auburn v. U.S. Government*, 154 F.3d 1025, 1031 (9th Cir. 1998). "If a railroad line falls within [the ICCTA's] jurisdiction, the STB's authority over abandonment is both exclusive and plenary." *Railroad Ventures, Inc. v. Surface Transp. Bd.*, 299 F.3d 523, 530 (6th Cir. 2002). In other words, "Congress has delegated to the [STB] exclusive jurisdiction to regulate 'transportation by rail carriers' and 'the construction, acquisition, operation, abandonment, or discontinuance' of rail facilities . . . with the instruction that the agency 'ensure the development and continuation of a sound rail transportation system' [citation omitted]." *City of South Bend, IN v. Surface Transp. Bd.*, 566 F.3d 1166, 1168 (D.C. Cir. 2009).

In *Emerson v. Kansas City Southern Ry. Co.*, 503 F.3d 1126, 1130 (10th Cir. 2007), the United States Court of Appeals for the Tenth Circuit stated:

" '[T]he courts have found two broad categories of state and local actions to be preempted regardless of the context or rationale for the action. The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized.

" 'Second, there can be no state or local regulation of matters directly regulated by the Board—such as the construction, operation, and abandonment of rail lines (*see* 49 U.S.C. §§ 10901-10907); railroad mergers, line acquisitions, and other forms of consolidation (*see* 49 U.S.C. §§ 11321-11328); and railroad rates and service (*see* 49 U.S.C. §§ 10501(b), 10701-10747, 11101-11124).' "

Moreover, the Kansas Supreme Court has recognized that "there are areas related to railroads and the possession and use of railroad right-of-way where Congress expressly preempts state law," noting:

"[T]he federal regulation of railroads . . . is both pervasive and comprehensive. See, *e.g.*, *Chicago & N.W. Tr. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 101 S. Ct. 1124, 67 L. Ed. 2d 258 (1981). Numerous court decisions recognize

that Congress has exercised preemptive, if not exclusive, power to regulate the railroads. See, *e.g.*, *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 128, 111 S. Ct. 1156, 113 L. Ed. 2d 95 (1991) (Congress' intent to exempt railroads from antitrust laws and all other laws, including state and municipal laws, was 'clear, broad and unqualified'); *Chicago & N.W. Tr. Co.*, 450 U.S. at 320 (ICC's [now STB's] abandonment authority is 'plenary' and 'exclusive'); *Missouri Pacific R.R. Co. v. Stroud*, 267 U.S. 404, 408, 45 S. Ct. 243, 69 L. Ed. 683 (1925) (Congress' acts concerning interstate commerce are 'supreme and exclusive').

"In addition, through other legislation, Congress has exercised federal authority over railroad rights-of-way when possessed for railway purposes. For example, the STB preemption statute provides that the STB's jurisdiction over 'the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities . . . is exclusive.' 49 U.S.C. § 10501(b) (2010). This provision continues with an express statement of preemption: '[T]he remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.' 49 U.S.C. § 10501(b)." *Board of Miami County Comm'rs*, 292 Kan. at 295-98.

As such, it is apparent "that a state or local law that permits a non-federal entity to restrict or prohibit the operations of a rail carrier is preempted under the ICCTA." *Norfolk Southern Ry Co. v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010). But states and municipalities "may exercise traditional police powers . . . to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions." *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005). Therefore, the ICCTA "preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008).

*Application of ICCTA*

FYG argues that the WTA waived its right to assert federal preemption as a defense. Based on our review of the record, however, we find that the WTA timely asserted that the STB has exclusive jurisdiction over the removal of railroad track. As noted in *Wichita*

*Terminal Association II*, it was the district judge handling the hearing held on June 9, 2009, who *sua sponte* raised the possibility of removing the north railroad track to accommodate the construction of a crossing at Emporia Court. As such, the panel in *Wichita Terminal Association II* found that "the district court abused its discretion in ordering removal of the track" and it reversed "that portion of the [July 20, 2009] order in which the district court sua sponte ordered a remedy that was neither proposed by the parties nor supported by the evidence . . . ." 2011 WL 588505, at *6, 11.

A review of the record reveals that counsel for the WTA immediately questioned the district court's authority to order the removal of railroad track when the judge first raised this issue at the hearing on June 9, 2009. In addition, the WTA filed an objection to the proposed journal entry following the hearing on the grounds that the district court exceeded its jurisdiction and authority because the removal of railroad tracks falls under the exclusive jurisdiction of the STB as set forth in the ICCTA. Furthermore, the WTA expressly presented the issue of STB jurisdiction to a panel of this court in *Wichita Terminal Association II*. In particular, the WTA argued in the second appeal that the remedy ordered by the district court was "preempted by the ICCTA because it forces abandonment of the track and results in an unreasonable burden on interstate commerce." 2011 WL 588505, at *6. Although the panel in *Wichita Terminal Association II* did not reach the issue, we conclude that the WTA timely asserted and therefore preserved the issue of federal preemption.

As indicated above, the ICCTA expressly grants exclusive jurisdiction to the STB over "the construction, acquisition, operation, abandonment, or discontinuance" of railroad tracks. 49 U.S.C. § 10501(b)(2). Likewise, 49 U.S.C. § 10903(d) (2006) requires the approval of the STB before an interstate rail carrier can be lawfully abandoned. "In general, this abandonment licensing requirement applies to all carrier lines, including both 'main' lines and 'branch' lines . . . ." *Joseph R. Fox—Petition for Declaratory Order*, 2009 WL 1383503, at *2 (S.T.B. 2009). Furthermore, even a railroad track "excepted under 49 U.S.C. 10906 from the need to obtain Board authority for the construction, abandonment, or operation,

is nevertheless subject to the Board's jurisdiction and is not subject to state or local regulation." 2009 WL 1383503, at *3; see also *United Transp. Union v. Surface Transp. Bd.*, 183 F.3d 606, 612 (7th Cir. 1999).

In *Port City Properties v. Union Pacific R. Co.*, 518 F.3d 1186, 1188 (10th Cir. 2008), the Tenth Circuit noted that 49 U.S.C. § 10906 provides that "the STB has no authority over the regulation of spur and industrial tracks as opposed to main railroad lines." But "[t]hat authority is left entirely to railroad management who may contract services as they see fit." 518 F.3d at 1189. "In sum, Congress granted exclusive jurisdiction to the STB over the construction, operation, and abandonment of spur or industrial lines, thereby precluding state regulation" and "then withdrew regulation of such lines from the STB leaving their management solely to the respective railroads." 518 F.3d at 1189.

In *Union Pacific Railroad Company—Judgment with Order*, 2001 WL 1396718 (S.T.B. 2001), the STB held that a city could not require a rail carrier to remove tracks without filing an application for adverse abandonment. In reaching this holding, the STB noted that "[t]he board and the courts have consistently held that such local regulation [of railroad carriers] is precluded." 2001 WL 1396718, at *3 (citing *New Orleans Terminal Company v. Spencer*, 366 F.2d 160, 163-64 [(5th Cir. 1966]) (an ordinance requiring the removal of railroad crossings was unenforceable); *City of Des Moines, Iowa v. Chicago & N.W. Ry. Co.*, 264 F.2d 454, 457-60 (8th Cir. 1959) (city could not oust a rail carrier from using streets without abandonment authority).

Although it is unfortunate that this action must be further delayed, we are obligated to conclude as a matter of law that the STB has exclusive jurisdiction over the question of whether the WTA should be required to remove the north track and to construct a new track south of the existing tracks. Accordingly, we vacate those portions of the journal entry filed on January 25, 2012, which purport to require the "removal of the north track coupled with the laying of a new track south of the existing tracks." We also conclude that it is within the exclusive jurisdiction of the STB to determine whether constructing a permanent railroad crossing at Emporia

Court is impossible or would unreasonably burden interstate commerce—even with the relocation of north track—as the WTA contends.

Under the ICCTA, a rail carrier or a third party may file a petition seeking a declaration of abandonment of a railroad track. See *Modern Handcraft, Inc.*, 363 I.C.C. 969, 971 (1981) (adjacent landowner has standing to bring adverse abandonment action). During oral argument, counsel for the WTA represented that his client was willing to file an application with the STB for determination of the issues within its jurisdiction. Because the WTA has been under an order to provide access to FYG's real property by installing a permanent railroad crossing at Emporia Court for several years, we believe it is appropriate for the WTA to initiate an action before the STB to obtain a determination of those questions within the STB's jurisdiction. Of course, if FYG would prefer to commence an adverse abandonment action in the STB, it may do so.

"In the case of an 'adverse' abandonment proceeding—one brought by a party other than the carrier whose operating authority is at issue—[a] finding that the public convenience and necessity do not require . . . operation of the track by the carrier in question removes [the STB's] exclusive and plenary jurisdiction as a regulatory obstacle to abandonment, thereby enabling the parties to undertake other legal remedies . . . . Where no overriding federal interest exists, [the STB] will not allow [its] jurisdiction to be used to shield a carrier from the legitimate processes of state law. [Citation omitted.]" *CSX Corporation and CSX Transportation, Inc.—Adverse Abandonment Application*, 2002 WL 127074, at *4 (S.T.B. 2002).

Thus, the STB may impose appropriate remedies and/or decide if "removal of [its] jurisdiction as a shield against state law is in the public interest." 2002 WL 127074, at *4.

Finally, we have no reason to dispute the district court's conclusion that "the most viable option for providing access to F.Y.G.'s real property is removal of the north track coupled with the laying of a new track south of the existing tracks." Moreover, we have no reason to dispute the district court's conclusion "that removal of the north track would allow the Emporia Court location to be built in compliance with the MUTCD." Based on our review of the record, we find that substantial evidence supported both of these

conclusions. To enforce such a remedy, however, the STB must either relinquish its jurisdiction to the district court or approve of the removal and reconstruction of track to allow for the installation of a permanent railroad crossing at Emporia Court.

### CONCLUSION

Accordingly, we remand this case to the district court and direct it to enter an order requiring the WTA to file an application with the STB to resolve any issues concerning the STB's jurisdiction no later than 60 days following the issuance of a mandate from this court. Until the STB has completed its review, the district court shall retain jurisdiction to enforce its order requiring the WTA to keep open a temporary crossing over its railroad tracks in order to provide reasonable access from 25th Street to FYG's real property.

Affirmed in part, vacated in part, and remanded with directions.