**FIFTH DIVISION
MCFADDEN, P. J.,
BROWN and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 27, 2023**

# In the Court of Appeals of Georgia

A23A1021. HARTWELL RAILROAD COMPANY et al. v. HARTWELL FIRST UNITED METHODIST CHURCH, INC.

BROWN, Judge.

In this dispute over a ten-foot wide strip of land on which sits a railroad spur track constructed in 1913, Hartwell Railroad Company, F/K/A Hartwell Railway, and The Great Walton Railroad Company (collectively "Walton") appeal from the superior court's order entering declaratory judgment and a permanent injunction in favor of The Hartwell First United Methodist Church, Inc. ("the Church") and denying Walton's cross-motion for declaratory judgment. For the reasons set forth below, we affirm the superior court's grant of declaratory judgment in favor of the Church but vacate the permanent injunction.

"A trial court's findings of fact after a declaratory judgment hearing are analogous to a jury verdict and will not be interfered with if there is any evidence to support them. However, we review the trial court's conclusions of law de novo." (Citation and punctuation omitted.) *Brown v. Brown*, 359 Ga. App. 511, 517 (857 SE2d 505) (2021). Additionally,

> [w]e review a trial court's grant of a permanent injunction for a manifest abuse of discretion. We review issues of law de novo, applying the plain legal error standard of review. With respect to factual issues we construe the evidence in favor of the trial court's findings and affirm if there is any evidence to support them, regardless of whether the evidence would also support opposite findings.

(Citations and punctuation omitted.) *Doxey v. Crissey*, 355 Ga. App. 891 (846 SE2d 166) (2020).

Viewed in this light, the record shows that the property at issue is a roughly ten-foot-wide strip of land which runs parallel to the railroad mainline just west of Webb Street in Hartwell, Georgia. On this strip of land sits a railroad spur. Both the spur and mainline sit adjacent to the Church's campus, but the Church owns the land to the north and south of the mainline. The parties generally agree that a predecessor of Walton obtained a 20-foot-wide right of way (10 feet on either side of the

centerline) for the mainline through an 1880 condemnation award and that the mainline, along with the spur track,[1] are depicted on the valuation map[2] for the Hartwell Railroad dated June 30, 1916 ("the 1916 Map"). However, as the trial court found, the spur track is depicted *within* the 20-foot-wide right of way of the mainline although it is undisputed that the spur track at issue has never resided in the mainline's 20-foot right of way. In 1919, the spur was extended across Webb Street and was later linked back to the mainline at a point located between Webb and Jackson Streets, making it a runaround track.[3] The runaround track was still in use in 1990 when the railroad was acquired by Walton through a quit claim deed. The quit claim deed includes the following description:

---

[1] According to the affidavit of Walton's owner, the spur track was constructed in 1913 by the Hartwell Railway Company.

[2] According to the National Archives, railroad valuation maps originally were created between 1915 and 1920, pursuant to the Valuation Act of 1913. The Interstate Commerce Commission used these maps, which detailed the rail lines, railroad facilities, and land adjacent to the railroad, to determine rates. https://www.archives.gov/files/citizen-archivist/images/03-21-2019-railroad-valuation-maps.pdf.

[3] Only the portion of the runaround track west of Webb Street — the original spur track — is at issue. In its order, the trial court refers to this portion as the "North Spur track."

3

A right of way and associated property between Bowersville and Hartwell, Georgia, being approximately 9 and 6/10th miles in length, and which is approximately as shown on the drawing below.

The drawing depicts the mainline, a portion of which is circled and labeled "Hartwell." It does not depict a spur or runaround track. Walton continued to use the runaround track for the next ten to twelve years.

In 2002, the Church acquired the roughly half-acre parcel of land immediately north of the mainline pursuant to a quit claim deed with Springs Industries, Inc. The parcel was acquired in 1907 by Farmers Union Warehouse Company. The recorded deed pertinently describes the parcel as "lying on the north side of The Hartwell Railroad at the crossing of Webb Street and running north with said street . . . about (100) one hundred feet, to the corner[.]" After a break in the chain of title, The Perfect Pea Picker Company acquired the parcel by deed in 1920, with the description "[b]eginning at a stake corner on the Hartwell Railroad, and running along Webb Street in a northerly direction about 100 feet[.]" The deed does not mention the spur, which the parties agree had been built at this point. A 1922 deed conveying a "certain manufacturing plant consisting of a building and grounds upon which it rests" describes a "building . . . facing 90 feet on Webb Street" and "being bounded on the

East side by Webb Street; South by Southern Railway right-of-way[.]" Thereafter, deeds in the chain of title describe the relevant portion of the property as fronting Webb Street 90 feet and being bound on the south by the railroad right of way. In 1990, a plat survey was prepared in connection with a conveyance to the Hart County Industrial Building Authority. Both the deed and plat reflect that the parcel contains 0.564 of an acre with 97.74 feet fronting on Webb Street beginning at the centerline of the railroad mainline right of way. Thus, this plat survey shows the spur track as being within the boundaries of the parcel acquired by the Church.

*The License Agreements*

In 2007 and 2008, Walton and the Church entered into three license agreements, allowing for the installation of underground pipes under the spur and mainline tracks and for pedestrian and vehicular traffic crossing. The two agreements allowing for crossings contain a provision providing that the Church would not "at any time own or claim any right, title or interest in or to railroad's property occupied by [the Church's] crossing, nor shall the exercise of this Agreement for any length of time give rise to any title to said property or any right or interest." The third agreement, allowing for underground pipes, does not include this language. In 2008, Walton removed the rail from the spur track, but not the underlying crossties. After

removal of the rails, the Church graded, filled, and installed a concrete sidewalk and landscaping.

*A Dispute Arises*

In 2015, Walton entered into a 99-year Lease/Purchase Agreement with Transformation Opportunities in Revitalizing Communities of Hartwell,Inc./TORCH of Hartwell, Inc. ("TORCH") for the entirety of Walton's holdings in the area, including the mainline adjacent to the Church property.[4] TORCH is a non-profit group working to convert portions of the mainline railroad and ancillary buildings in downtown Hartwell for use as a public park, playground, farmer's market, and walking trail.

In 2016, the Church filed an adverse abandonment action with the Surface Transportation Board ("STB"), requesting that the STB authorize adverse abandonment and discontinuance of 0.25 miles of Walton's rail line in Hartwell in order to quiet title to the property underlying the rail line.[5] In August and October

---

[4] Walton's owner testified that Walton did not lease the railroad tracks to TORCH, that the track behind the Church is no longer part of the lease, and that this was clarified in an "amended lease." But this "amended lease" does not appear to be part of the appellate record.

[5] According to the STB, the parties dispute whether the spur/runaround track was included in the STB's decision. In the Church's original filing before the STB,

6

2016, Walton notified the Church that it intended to "rehabilitate its tracks." On November 10, 2016, the Church published notice of its intent to file proceedings before the STB seeking authority for the adverse abandonment and discontinuation of a section of the railroad tracks and right of way, which included the mainline adjacent to the Church's 0.564-acre parcel. The final Notice of Adverse Abandonment was published on November 23, 2016, in the *Hartwell Sun*.[6] On the same day, Walton removed the Church's landscaping and sidewalk and began reconstructing the spur track.[7] The Church filed a Petition for Declaratory Judgment and for Injunctive Relief in the Superior Court of Hart County on November 28, 2016, and the trial court granted a preliminary injunction halting further construction of the spur track outside of the 20-foot right of way.

---

it asserted that the spur/runaround track was no longer in existence and thus was not included as the target of its adverse abandonment application. Accordingly, the STB's denial of the application was limited to the track identified, which did not include the spur/runaround track. The STB was silent on the regulatory status of the spur/runaround track.

[6] The Church's adverse abandonment application was denied by the STB on January 31, 2018.

[7] Walton asserts that it began rehabilitating the track and replacing the rail because it was necessary to resume using the runaround track as a safer alternative to "push[ing]" or "shoving" railroad cars.

In December 2016, Walton filed a notice of removal of the case to federal district court, but the district court found that "federal law does not completely preempt a determination of the parties' relative state law property rights" and remanded the case to the Superior Court of Hart County in 2017 to make that determination.

*The Condemnation Proceedings*

After the attempted removal to federal court, Walton filed a condemnation action pursuant to OCGA § 46-8-120 before the Georgia Public Service Commission in October 2017.[8] The Church intervened in the proceedings pursuant to OCGA §§ 46-2-59 and 50-13-14. A hearing was held before a hearing officer who rendered a decision in favor of Walton. Upon full Commission review of the hearing officer's decision, the Commission reversed the hearing officer's decision and denied Walton's petition. Walton filed a motion for reconsideration which also was denied. The Commission's decision denying the condemnation was subsequently upheld on appeal in the Superior Court of Fulton County. In an unpublished opinion, this Court

---

[8] According to the Commission's order, "[t]he real estate parcel at issue [in the condemnation proceedings] is a certain strip of land, measuring twenty (20) feet by two hundred sixty (260) feet, abutting the southern portion of the original property of [the Church] . . . beside the Hartwell Railroad main line."

affirmed the superior court, finding that there was ample evidence to support the Commission's finding that condemnation of the subject property would serve no public purpose.[9] *Great Walton R. Co. v. Ga. Public Svc. Comm.*, 356 Ga. App. XXVIII (Sept. 30, 2020) (unpublished). The Supreme Court denied certiorari, and following remittitur, the case was returned to the Superior Court of Hart County for a final decision on the Church's petition.

*Further Proceedings Before the STB*

In November 2019, Walton filed a petition for declaratory order with the STB, asserting that the STB has exclusive jurisdiction over the spur/runaround track and therefore efforts to block Walton's restoration of the track are preempted. In a June 23, 2020 order, the STB concluded that the spur/runaround track is ancillary track

---

[9] See OCGA § 46-8-121, which provides:
Authority and power are granted to railroad companies to acquire by purchase or gift and to hold such real estate as may be necessary for all of the purposes mentioned in Code Section 46-8-120. If the real estate cannot be acquired by purchase or gift, then it may be acquired by condemnation in the manner provided in Title 22, provided that the right of condemnation under this Code section shall not be exercised until the commission, under such rules of procedure as it may provide, first approves the taking of the property.
"If the Commission ultimately determines such condemnation to serve a public purpose, it shall issue a final order approving any condemnation petition by a railroad company." Ga. Comp. R. & Regs. R. 515-16-16-.03.

9

that never became part of Walton's regulated rail line. According to the STB's order, a regulated rail line is within the STB's exclusive jurisdiction and can only be abandoned upon receiving abandonment authority from the STB. Ancillary track is also within the STB's exclusive jurisdiction, but STB authorization is not required for the abandonment or discontinuance of ancillary track. However, the STB deferred ruling on whether the track was removed from the interstate rail system (such that it was no longer within the STB's exclusive jurisdiction) pending the state court proceedings. The STB noted that if Walton established a property interest in the land underlying the spur/runaround track in the state court proceedings, it would be free to reconstruct the track regardless of whether it had previously been removed from the interstate rail system. If Walton was unsuccessful in establishing such an interest, the STB concluded it "may need to determine whether the runaround track remains part of the interstate rail system." The STB held the matter in abeyance pending the state court proceedings.

*The Final Decision in Superior Court*

When the case was returned to the superior court, the Church moved for a decision on its petition. Walton subsequently put forth a new survey of the subject property prepared by a land surveyor retained by Walton. The surveyor averred that

10

"the southern property line of the [Church] does not extend to the railroad's mainline right of way" and that the spur track at issue "is not located on the Church's property . . . based upon my review of the property deeds and the survey that I conducted." A final hearing was held in August 2022.

After the hearing, the superior court issued a detailed 13-page order finding that Walton has never had fee simple title to the property underlying the spur track, and that the Church is the fee simple title owner of the 0.564-acre parcel delineated in the recorded 1990 survey, including the property underlying the spur track. The court rejected Walton's argument regarding the variation in footage fronting Webb Street, finding as follows:

> There is no competent evidence before the Court to conclude that there is a gap in the property conveyed to [the Church] by deed and plat of survey, and there is no evidence before the Court to support that if a gap existed the gap would be found along the southern property line (as argued by [Walton]) versus the northern property line of the parcel, and there is no evidence to support that if a gap existed the location of the former North spur track was within such a gap.

The superior court further found that the 1990 survey accurately reflects the property granted to the Church. As to the survey proferred by Walton, the court found that "the methodology of the survey in its creation and lack of courses . . . is not persuasive"

11

and further "that the survey is uncertain and lacking the requisite definitiveness for this Court to rely upon as being true and accurate — especially regarding the [Church's] easternmost property line on Webb Street[.]"

As to the parties' adverse possession claims, the court concluded that Walton's claim of ownership by prescriptive title was "moot due to the undisputed fact that [Walton] removed the former North Spur track (rails and appurtenances) in 2008." Conversely, the court found that the Church "exclusively controlled and occupied the subject property under all of the requirements . . . for prescriptive title by adverse possession . . . from 2008 until [Walton] reentered the property in 2016 — more than the requisite seven years under color of title." The superior court further concluded that if Walton ever acquired a prescriptive easement of the land underlying the spur track, Walton abandoned any easement rights to the property pursuant to OCGA § 44-9-6, by removing the rails in 2008 and ceasing all use until the attempted reconstruction in 2016. The court also noted the 99-year lease Walton signed with TORCH was indicative of Walton's intent to abandon its main line rail use and cease any further rail traffic over the land.[10]

---

[10] The superior court found that Walton's "interest in the North Spur and intent to claim title to the property underneath the former spur only arose when the TORCH lease income may have been threatened by the [Church's] adverse abandonment

12

In sum, the superior court declared the Church the fee simple title owner of the 0.564-acre parcel delineated in the recorded 1990 survey, including the property underlying the spur track, free and clear of all claims by Walton. Finding Walton's continued occupation of the Church's property an unlawful trespass and that the Church was entitled to an injunction enjoining Walton from said trespass, the court ordered Walton to remove the rail lines and appurtenances to the reconstructed spur track on the Church's property and restore it to its condition as it existed before Walton reentered the property in 2016. The court denied Walton's cross-motion.

*Walton's Appeal*

Walton now appeals from the superior court's order. Walton contends that the superior court disregarded the unambiguous language in the subject deeds showing that the Church did not own the property and disregarded the three license agreements between Walton and the Church expressly providing that the Church did not own and would not assert title to the property. It also contends that the court erred in alternatively concluding that the Church acquired title to the property by adverse possession. Finally, Walton asserts that the trial court erred in entering a permanent

claims of the main line before the STB in 2016."

13

injunction requiring it to remove the spur track because the Surface Transportation Board has exclusive jurisdiction of matters related to the removal of railroad tracks.

Walton does not enumerate as error the superior court's rulings that Walton does not have a real property interest in the land via adverse possession or prescriptive easement. As such, those rulings are not before us. See *Russell v. Barnett Banks*, 241 Ga. App. 672, 673 (527 SE2d 25) (1999).

1. *Title by deed*. Walton contends that the superior court erred in concluding that the Church acquired fee simple title to the property underlying the spur track by deed. Specifically, Walton points out that every deed in the chain of title from 1922 until 1990 described the Church's lot north of the mainline as fronting 90 feet on Webb Street, and because the lot extended only 90 feet, it did not reach the railroad's mainline right of way and a gap of 10 feet results from the southernmost point of the lot and the northernmost point of the mainline right of way. According to Walton, the spur track fits entirely within this gap. Walton asserts that the plat survey prepared in 1990 by Teasley, and relied on by the superior court, erroneously shows a total of 97.4 feet fronting on Webb Street, which conflicts with the deeds in the chain of title.

Walton's theory disregards the plain language of the deeds in the chain of title, which all reference the Hartwell Railroad as the southern boundary line, as well as

14

well-established principles for determining property boundaries based on deed descriptions.

> Where the calls of a deed are for natural as well as known artificial objects, both courses and distances, when inconsistent, must be disregarded. . . . Artificial boundaries as applied to this case include fences, roads, streets, and land lot lines. They are evidence of the points which land owners, past and present, had in mind in their contractual dealings with one another. . . . What is most material and most certain in a description shall prevail over that which is less material and less certain. Thus courses and distances yield to natural, visible, and ascertained objects.

(Citations and punctuation omitted.) *Martin v. Patton*, 225 Ga. App. 157, 162-163 (2) (483 SE2d 614) (1997) (physical precedent only). See also *Riley v. Griffin*, 16 Ga. 141, 147 (1854).[11] "[C]ourses and distances occupy the lowest, instead of the highest grade, in the scale of evidence, as to identification of land." *Riley*, 16 Ga. at 148.

To the extent that the 1922 deed's description of a 90-foot frontage on Webb Street conflicted with its description of being bound on the "South by Southern Railway right-of-way," the artificial boundary controls. See *Kobryn v. McGee*, 232

---

[11] As stated by Pindar's Ga. Real Estate Law & Procedure § 19:165 (7th ed.), the 14 principles espoused by Justice Lumpkin in *Riley*, supra, for determining actual boundaries based on descriptions in deeds, are still good law.

Ga. App. 754, 755 (1) (503 SE2d 630) (1998) (where deed's metes and bounds description of property line conflicted with deed provisions setting the western property line as the "'center line of a ditch,'" natural boundary prevailed). See also *Lyons v. Bassford*, 242 Ga. 466, 470 (1) (249 SE2d 255) (1978) (boundary fence referred to in deed prevailed over distances called for in the deed). And, it is undisputed that the spur track has never been in the railroad's 20-foot right of way. Indeed, every deed in the chain of title for the Church's lot has described the southern boundary line as the railroad right of way — even prior to the spur track's existence. It follows that the deed descriptions embrace the property underlying the spur track. This description of the lot has been consistent in spite of the varying metes and bounds descriptions. To hold that this change or variation from 100-foot to 90-foot frontage on Webb Street controls over the artificial boundary described in the deeds would conflict with our well-established rules of interpreting descriptions in deeds. As our Supreme Court explained in *Morgan v. Godbee*, where a deed description calls for the railroad right of way as the boundary line, the railroad right of way is fixed as the boundary line, "wherever it may be."[12] 146 Ga. 352, 354 (2) (91 SE 117) (1917).

---

[12] In that case, the seller of the property represented to the purchaser "that he was selling to the plaintiff the land on the north side of the center line of the railroad up to within 50 feet thereof." 146 Ga. at 353-354. However, the actual railroad right

16

Here, because the deeds in the chain of title call for the railroad right of way as the boundary line, and the spur track resides outside the right of way, the Church's lot adjacent to the railroad necessarily includes the property underlying the spur track.

It also is noteworthy that the first deed describing a 90-foot frontage on Webb Street was the 1922 deed conveying a "certain manufacturing plant consisting of a building and grounds upon which it rests" and the description therein refers to a "*building . . .* facing 90 feet on Webb Street." (Emphasis supplied.) Thus, it is unclear whether this description was intended to alter the boundary line for the underlying property.

As to Walton's purported ownership of the property underlying the spur track, it is undisputed that Walton's predecessor only received a 20-foot right of way for its mainline, and that the spur track sits outside that 20-foot right of way. Simply put, there is nothing in the record showing that Walton ever had any interest in the land on which the spur track sits.[13] Accordingly, the superior court was correct in

---

of way extended 100 feet from the center of the track. Id. The Court held that the plaintiff-purchaser was not entitled to "possession of that portion of the land which lies between lines drawn 50 feet and 100 feet from the center of the railroad track" because that portion was "not embraced in the description in the deed." Id. at 354.

[13] As already explained, whether Walton acquired prescriptive title to the property underlying the spur track is not before us because Walton has not

17

concluding that the Church acquired fee simple title to the property underlying the spur by deed.

2. *The License Agreements.* Walton next contends that the superior court erred in disregarding the language in the license agreements providing that the Church would not "at any time own or claim any right, title or interest in or to railroad's property occupied by [the Church's] crossing, nor shall the exercise of this Agreement for any length of time give rise to any title to said property or any right or interest." Without citation to law, Walton argues that the Church's petition claiming ownership of the at-issue property violates and directly contradicts the license agreements, which should govern the present dispute. There is no merit to this argument. The license agreements and attached renderings are immaterial if Walton never had any interest in the property underlying the spur track, as concluded above. As the superior court stated, the license agreements "should not be interpreted to convey ownership in real property, to divest ownership in real property, or to forcibly admit ownership of the real property in and to [Walton] when no ownership existed."

enumerated the superior court's ruling on that issue.

3. *Adverse Possession by the Church.* Given our holding, supra, we need not address Walton's assertion that the superior court erred in concluding that the Church acquired prescriptive title to the property underlying the spur.

4. *Permanent Injunction.* Walton contends that the superior court erred in granting the Church's requested injunctive relief because the removal and abandonment of railroad tracks falls under the exclusive jurisdiction of the STB. Essentially, Walton argues that the remedy ordered by the superior court is preempted by the Interstate Commerce Commission Termination Act ("ICCTA") because it forces abandonment of the track and that the removal of railroad track falls under the exclusive jurisdiction of the STB. As explained below, Walton appears to be correct.

In its petition, the Church sought a permanent injunction preventing Walton "from any further occupation or use of the Church property north of the railroad track as it existed on November 23, 2016." The superior court agreed that the Church was entitled to an injunction enjoining Walton from trespassing on the Church's property and ordered Walton to remove the rail lines and appurtenances to the reconstructed spur track and restore it to its condition as it existed before Walton reentered the property in 2016. In its order, the court noted that the STB must authorize abandonment of a rail line, but "the STB has specifically determined that the North

Spur is not part of [Walton's] line of railroad, and thus, no STB authority was required before [Walton] abandoned the North spur."

As already recounted, the STB concluded that the spur/runaround track is ancillary track under 49 U.S.C. § 10906.[14] Because the spur track is ancillary, Walton "could have, and might have, removed it from the interstate rail system by its conduct and intent without needing to seek Board authority to do so." However, the STB deferred ruling on whether the track was removed from the interstate rail system such that it was no longer within the STB's exclusive jurisdiction pending the state court proceedings. If Walton was unsuccessful in establishing a property interest, the STB concluded it "may need to determine whether the runaround track remains part of the

---

[14] This Code section provides:
Notwithstanding section 10901 and subchapter II of chapter 113 of this title, and without the approval of the [STB], a rail carrier providing transportation subject to the jurisdiction of the [STB] under this part may enter into arrangements for the joint ownership or joint use of spur, industrial, team, switching, or side tracks. The [STB] does not have authority under this chapter over construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks.

interstate rail system." The STB held the matter in abeyance pending the state court proceedings.[15]

> Congress has placed the power to regulate railroads with the STB (formerly known as the Interstate Commerce Commission), and it has granted the STB broad jurisdiction over transportation by rail carriers. This power to regulate railroads derives from the Interstate Commerce Act, as modified by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), which is among the most pervasive and comprehensive of federal regulatory schemes and has consequently presented recurring pre-emption questions from the time of its enactment.

(Citations and punctuation omitted.) *McCloud-Pue v. Atlanta Beltline Inc.*, 364 Ga. App. 789, 791-792 (874 SE2d 482) (2022).

---

[15]     [I]t is well settled that the interpretation of deeds and the determination of who owns good title to property are issues of state law that are outside of the expertise of the Board, [and] the most appropriate course of action at this point was to direct petitioners to state court to get the underlying property law issues resolved.

(Citations omitted.) *Central Kansas Railway, Ltd. Liability Co. — Abandonment Exemption — in Marion & Mcpherson Counties, Kansas*, No. AB-406 (SUB 6X), 2001 WL 489991, at *2 (May 8, 2001).

[P]rior to the passage of ICCTA, state regulatory agencies had some authority over excepted [ancillary] track, [but] ICCTA added a new provision that specifically establishes the exclusivity of the Board's jurisdiction over "transportation by rail carriers." This jurisdiction includes exclusive jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State." 49 U.S.C. 10501(b) (1) (2). When sections 10501 (b) and 10906 are read together, it is clear that Congress intended to occupy the field and preempt state jurisdiction over excepted track [under section 10906], even though Congress allowed rail carriers to construct, operate, and remove such facilities without [STB] approval. Therefore, Federal courts have uniformly held that state law tort claims . . . — which would interfere with rail carrier operations, including operations involving spur, industrial, team, switching, or side tracks — are preempted.

(Citation and footnote omitted.) *Joseph R. Fox — Petition for Declaratory Order*, No. FIN 35161, 2009 WL 1383503, at *3 (May 18, 2009).[16] In other words, "even a railroad track excepted under 49 U.S.C. § 10906 from the need to obtain [STB] authority for the construction, abandonment, or operation, is nevertheless subject to

_____

[16] "Recognizing that the STB is uniquely qualified to determine whether state law should be preempted by the ICCTA, courts have traditionally looked to STB decisions when analyzing a claim of preemption." (Citation and punctuation omitted.) *McCloud-Pue*, 364 Ga. App. at 792-793.

22

the Board's jurisdiction and is not subject to state or local regulation." (Citation and punctuation omitted.) *Wichita Terminal Assn. v. F.Y.G. Investments*, 305 P3d 13, 21 (Kan. Ct. App. May 31, 2013). Thus, while the STB has deemed the spur track at issue ancillary track excepted under § 10906 and thus STB approval is not required for abandonment, the track is still under the STB's jurisdiction. Moreover, given the STB's conclusion that it may need to determine whether the spur/runaround track remains part of the interstate rail system if Walton was unsuccessful in the superior court proceedings in establishing a property interest in the land underlying the track, a further determination by the STB may be necessary before Walton is required to permanently remove the track. At this juncture, we cannot say that the superior court's permanent injunction requiring removal of the track is appropriate, and we vacate that portion of the superior court's order.

*Judgment affirmed in part and vacated in part. McFadden, P. J., and Markle, J., concur.*