No. 86,769

JULES V. DOTY, *Appellee,* v. FRONTIER COMMUNICATIONS
INCORPORATED, *Appellant.*

(36 P.3d 250)

Opinion filed
December 14, 2001.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause and was on the briefs for appellant.

*Mark Doty*, of Gleason & Doty, Chartered, of Ottawa, argued the cause, and *Thomas E. Gleason, Jr.*, of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This first impression case raises issues of claimed preemption by the 1996 Federal Telecommunications Act, 47 U.S.C. § 151 *et seq.* (1994 ed., Supp. V. 2000), and the application of K.S.A. 2000 Supp. 50-6,103 (Kansas Act) of the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.,* to an unauthorized change of an interstate long-distance telephone services carrier (a practice commonly known as "slamming").

Both parties substantially agree as to the factual and procedural background of the case, but have strikingly divergent views of the applicable law.

In October 1999, the plaintiff, Jules V. Doty, experienced the change of his long-distance telephone service provider (Southwestern Bell Telephone Company) without his consent, knowledge, or authorization. The change order was apparently falsely implemented by a company called International Exchange Communications, Inc., (IEC) through Frontier Communications, Inc., (Frontier) to Southwestern Bell. Frontier did not verify the authority for the change (and contends it is not authorized to do so). Southwestern Bell made the requested change.

When Frontier billed Doty, he learned he had been "slammed" and filed suit in January 2000, alleging Frontier had "submitted or caused to be submitted" an unconsented order for change of services. He requested relief under K.S.A. 2000 Supp. 50-6,103 for statutory penalties and attorney fees.

Frontier's answer denied it had "submitted" the request for change in service and identified the company which may have been the source of the false and unauthorized request. Frontier claimed it had no liability under K.S.A. 2000 Supp. 50-6,103 and further contended that there was federal preemption of any state law inconsistent with federal communications statutes and regulations issued thereunder.

After cross-motions for summary judgment were filed, the trial court found that no essential facts were in dispute and ruled, as a matter of law, that Frontier had submitted the change order of Doty's long-distance carrier without his express authorization in violation of K.S.A. 2000 Supp. 50-6,103. The court awarded Doty a statutory penalty of $12,500 and attorney fees. After a motion for reconsideration was denied, Frontier has appealed.

The appeal was transferred to our court pursuant to K.S.A. 20-3018(c).

While we normally first answer jurisdictional arguments, Frontier's contention of no liability under K.S.A. 2000 Supp. 50-6,103 is intertwined with its claim of preemption, and we will discuss the two questions as submitted to us by the parties. We begin with some basic background information concerning the workings of the present-day telecommunications process.

When a consumer places a long-distance telephone call, the call is forwarded by his or her local exchange carrier that has facilities to receive, route, and transmit local telephone calls to the consumer's personal interexchange carrier, which is referred to as "a facilities based carrier." The telephone call is routed over separate long-distance facilities until it reaches the local exchange carrier of the recipient of the call, which then makes it available to the recipient.

The company which has the necessary facilities and equipment to transmit the long-distance calls is referred to as "a facilities based interexchange carrier." This facilities based interexchange carrier has its own carrier identification code which is utilized to transmit the telephone calls. A facilities based interexchange carrier can provide at retail its own long-distance service to consumers. But, after the AT&T breakup, competition was mandated and a new kind of carrier, "the switchless reseller," came into existence. The switchless reseller owns no equipment or facilities but purchases large blocks of long-distance time from a facilities based interexchange carrier at wholesale rates and resells that time at retail rates to consumers.

In the present case, a switchless reseller Interaction Exchange Communications, Inc. (IEC), apparently generated an uncon-

sented change order and sent it to Frontier, a facilities based interexchange carrier. IEC had a contractual agreement with Frontier to buy access to its network and facilities. Frontier in turn sent this order to Doty's local exchange carrier, Southwestern Bell, for execution. This required Southwestern Bell to reprogram its switching equipment so that Doty's calls would be routed automatically to the long-distance interexchange facilities owned by Frontier. This resulted in Frontier's billing to Doty, the filing of the lawsuit, and the result that we have previously stated leading to this appeal.

We first consider Frontier's argument that even if K.S.A. 2000 Supp. 50-6,103 does apply (which Frontier alternatively contends does not apply because of federal preemption), Frontier has not violated its provisions.

K.S.A. 2000 Supp. 50-6,103 was enacted by the Kansas Legislature, effective June 4, 1998, as a part of the KCPA and reads as follows regarding a "change of telecommunications service provider":

"(a) As used in this section:

(1) 'Express authorization' means an express, affirmative act by a consumer clearly agreeing to the change in the consumer's telecommunications carrier or local exchange carrier to another carrier.

. . . .

"(b) No local exchange carrier or telecommunications carrier shall submit to a local exchange carrier an order to change a consumer's telecommunications carrier or local exchange carrier to another carrier without having obtained the express authorization of the consumer authorized to make the change. The local exchange carrier or telecommunications carrier requesting the change shall have the burden of proving the express authorization by a preponderance of the evidence.

"(c) No local exchange carrier, telecommunications carrier or third party utilized to verify an order to change a consumer's telecommunications carrier or local exchange carrier to another carrier shall:

(1) Engage in any activity, conduct or representation while soliciting or verifying a change in a consumer's telecommunications carrier or local exchange carrier to another carrier that has the capacity to mislead, deceive or confuse the consumer:

. . . .

(3) use any methods not approved by the federal communications commission statutes, rules and regulations (as in effect on the effective date of this act) or state corporation commission rules and regulations to change a consumer's telecommunications carrier or local exchange carrier to another carrier.

"(d) Any local exchange carrier or telecommunications carrier that violates subsection (b) or (c) shall be subject to a civil penalty of not less than $5,000 nor more than $20,000 for each such violation instead of the penalty provided for in subsection (a) of K.S.A. 50-636, and amendments thereto.

"(e) Any violation of this section is a deceptive and unconscionable act or practice under the provisions of the Kansas consumer protection act and shall be subject to any and all of the enforcement provisions of the Kansas consumer protection act. Nothing in this section shall preclude the state corporation commission from exerting its authority as it pertains to intrastate services nor the attorney general from pursuing violations of any other provisions of the Kansas consumer protection act by a local exchange carrier or telecommunications carrier.

. . . .

"(g) This section shall be part of and supplemental to the Kansas consumer protection act."

Frontier's initial argument is that it is not the party which "submitted" the order to change Doty's personal interexchange carrier.

Frontier first contends the word "submit" in K.S.A. 2000 Supp. 50-6,103(b) should be defined by the Federal Communications Commission (FCC) regulations, 47 C.F.R. § 64.1100 *et seq.* (1999) because it is not defined by the Kansas Act. Second, because K.S.A. 2000 Supp. 50-6,103 expressly incorporates FCC regulations, any conflict would be contrary to legislative intent. This argument is part and parcel of Frontier's federal preemption argument. Finally, Frontier argues that the 2001 amendments to K.S.A. 2000 Supp. 50-6,103(b) show that the legislature did not intend, prior to the amendments, to penalize the innocent submission by a personal interexchange carrier of a change request. See L. 2001, ch. 115, § 1.

Both parties agree our standard of review over issues of statutory construction is plenary. *Babe Houser Motor Co. v. Tetreault,* 270 Kan. 502, 506, 14 P.3d 1149 (2000). We have pronounced several maxims for the interpretation of statutes:

"It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. [Citation omitted.] The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. . . . when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute. [Citation omitted.]" *In re Marriage of Killman,* 264 Kan. 33, 42-43, 955 P.2d 1228 (1998).

Also, under our rules of construction, "ordinary words are to be given their ordinary meaning." *Matjasich v. Kansas Dept. of Human Resources*, 271 Kan. 246, 246, 21 P.3d 985 (2001).

K.S.A. 2000 Supp. 50-6,103(b) states no "telecommunications carrier shall submit . . . an order to change . . . without . . . the express authorization" of the consumer. "Submit" means to "commit (something) to the consideration or judgment of another." Webster's II New Riverside University Dictionary 1154 (1st ed. 1984). Construing the statute under its plain meaning, Frontier's transmitting the unauthorized change order constituted a submission of the false and unauthorized request.

With the plain meaning rule resulting in a recovery by Doty, Frontier argues that "submit" as used in subsection (b) of K.S.A. 2000 Supp. 50-6,103 must be construed to follow the definition of "a submitting carrier" as set forth in 47 C.F.R. § 64.1100(e)(1) (1999), which stated:

"A submitting carrier is generally any telecommunications carrier that requests on the behalf of a subscriber [consumer] that the subscriber's telecommunications carrier be changed, and seeks to provide retail services to the end user subscriber. A carrier may be treated as a submitting carrier, however, if it is responsible for any unreasonable delays in the submission of carrier change requests or for the submission of unauthorized carrier change requests, including fraudulent authorizations."

This regulation provides definitions for the terms used in 47 U.S.C. § 258 (1994 ed. Supp. V. 2000), which is a part of the 1996 Federal Telecommunications Act. Frontier claims it would not fit within this definition because it did not seek to provide retail services to Doty (although the facts indicate Doty's billing was generated by Frontier). Under Frontier's argument, it cannot be liable as an intermediary carrier, that merely passes along the unauthorized request and is in fact an "executing carrier," which was defined in 47 C.F.R. § 64.1100(e)(2) (1999) as:

"An executing carrier is generally any telecommunications carrier that effects a request that a subscriber's telecommunications carrier be changed. A carrier may be treated as an executing carrier, however, if it is responsible for any unreasonable delays in the execution of carrier changes or for the execution of unauthorized carrier changes, including fraudulent authorizations."

Frontier points to subsection (c) of K.S.A. 2000 Supp. 50-6,103, which it claims incorporates the federal regulations promulgated under the 1996 Federal Telecommunications Act. This contention is untenable. The Kansas statute does not adopt the federal definitions for words in the Kansas Act. The regulations above quoted were not promulgated until February 1999, which was almost a year after the Kansas Act was passed. In addition, the express language of subsection (c)(3) of K.S.A. 2000 Supp. 50-6,103 states: "No . . . telecommunications carrier . . . shall . . . use any methods not approved by the [FCC] statutes, rules and regulations (*as in effect on the effective date of this act*)." (Emphasis added.) Frontier's attempt to utilize the federal regulations to define "submit" is not justified by the language of K.S.A. 2000 Supp. 50-6,103(c)(3).

Additionally, the restrictions in subsection (c) are separate from those in subsection (b), and, while we do construe statutes as a whole, it does not alter our duty to follow legislative intent as clearly expressed. See *In re Marriage of Killman,* 264 Kan. at 42-43. It must be noted that subsection (b) relates to the submission of a change order, while the operative word in subsection (c) is "verify." Even if 47 C.F.R. § 64.1100(e)(1) had been implicitly adopted by K.S.A. 2000 Supp. 50-6,103(c)(3) (which we note it could not have been), the second sentence says "a carrier may be treated as a submitting carrier . . . for the submission of unauthorized carrier change requests."

In 2001, the Kansas Legislature amended K.S.A. 2000 Supp. 50-6,103(b) to read: "No local exchange carrier or telecommunications carrier shall submit *or cause to be submitted* to a local exchange carrier an order to change a consumer's telecommunications carrier or local exchange carrier to another carrier without having obtained the express authorization of the consumer authorized to make the change." L. 2001, ch. 115, § 1(b). Frontier contends this change substantiates its argument that the prior statute was not intended to penalize innocent intermediaries for merely passing along change requests to the local exchange carrier.

The 2001 amendments to K.S.A. 2000 Supp. 50-6,103(c)(3) further provide:

"(c) No ~~local exchange carrier, telecommunications carrier or third-party util-ized to verify an order to change a consumer's telecommunications-carrier or local exchange carrier to another carrier~~ *supplier* shall:

"(3) use any methods not approved by *statute, regulations of* the federal communications commission ~~statutes, rules and regulations~~ *or federal trade commission* (as in effect on the effective date of this act) or state corporation commission rules and regulations to change a consumer's telecommunications carrier or local exchange carrier to another carrier." L. 2001, ch. 115, § 1.

Frontier argues this change causes all of the federal regulations it relies on to be required to be deemed applicable, and shows that 50-6,103(c)(3) was not intended to be limited to those regulations in effect in 1998.

We believe the better-reasoned result is to hold that the 2001 amendments to 50-6,103(c)(3) limit the application of FCC statutes and regulations to those that existed at the effective date of the amended act, which would not apply those regulations to the instant case. This gives meaning to the existing language of K.S.A. 2000 Supp. 50-6,103(c)(3), but does not require previously non-existent federal regulations to be now considered.

As to the addition of the "or cause to be submitted" language of 50-6,103(b), Frontier's requested interpretation suggests that prior narrow language is now greatly broadened. As we have previously discussed, the 1998 provisions of K.S.A. 2000 Supp. 50-6,103(b) apply to Frontier, and we do not believe that result is changed by the 2001 amendments. While there may be a colorable argument that we should not apply the plain definition of "submit" to the 1998 statutory language, the 2001 amendments appear to leave no question that any "supplier" who "submits or causes to be submitted" unauthorized requests is in violation of the Kansas Act, which is designed to protect Kansas consumers.

Legislative history would not seem to indicate there was any intent to change the effect and scope of K.S.A. 2000 Supp. 50-6,103 by the 2001 amendments. The Deputy Attorney General of the Consumer Protection Division, one of the main proponents of and contributors to the bill, stated "[T]he bill would provide cleanup language for the current statute." *Unauthorized Change of Consumer's Telephone Company or Addition of Unauthorized*

*Telephone Services: Hearings on H.B. 2099 Before the House Comm. on Utilities*, Reg. Sess. (2001). This comment suggests that the statute was to be broadly applied under the 1998, statutory wording and that the same result was desired under the 2001 amendments. "Cleanup language" is not indicative of an intent to change the basic construction of the statute. The added language might in fact be deemed to clarify that entities such as switchless resellers (IEC) that do not actually submit the change to the local exchange carrier but cause the request to be instigated should also be held liable.

It has not been argued to us whether the use of the word "supplier" in the 2001 amendments to subsection (c) in lieu of the stricken language has any significance, but this appears to carry out the intent of liability within the chain of submission where a Kansas consumer is slammed.

We hold that the 2001 amendments do not change our construction of the 1998 statutory provisions which we have made herein. K.S.A. 2000 Supp. 50-6,103 applies to Frontier's actions and justifies the penalty assessed and the attorney fees allowed, so long as the 1996 Federal Telecommunications Act has not preempted the entire area, preventing the Kansas Act from having any force or effect.

Frontier contends that the federal regulations do not permit it to verify the consumer authorization of personal interexchange carrier change requests. Since K.S.A. 2000 Supp. 50-6,103(b) penalizes intermediary or wholesale carriers who submit unauthorized requests from the retailer to the local exchange carrier, Frontier argues that compliance with both laws is impossible and that the Kansas statute must be preempted by the federal Act. This issue involves questions of statutory interpretation as well as preemption, both questions of law over which this court exercises de novo review. *Lindemuth v. Goodyear Tire & Rubber Co.*, 19 Kan. App. 2d 95, 99, 864 P.2d 744 (1993).

In dealing with a federal preemption challenge, Justice Allegrucci, speaking for a unanimous court, succinctly stated in *McShares, Inc. v. Barry*, 266 Kan. 479, Syl. ¶ 1, 970 P.2d 1005 (1998), *cert. denied* 526 U.S. 1158 (1999):

"Absent an express statement by Congress that state law is preempted, pre-emption occurs where there is an actual conflict between federal and state law, where compliance with both federal and state law is, in effect, physically impossible, where Congress has occupied the entire field of regulation and leaves no room for states to supplement federal law, or when the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."

Also see *Kansas ex rel Stovall v. Home Cable, Inc.*, 35 F. Supp. 2d 783, 787-88 (D. Kan. 1998), where the three circumstances of pre-emption were stated to be:

"First, Congress can define explicitly the extent to which its enactments pre-empt state law. [Citation omitted.] . . . .

"Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. . . .

"Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements . . . . [Citations omitted.]"

Frontier's argument of preemption is, as we have said, intertwined with its first issue where we set forth the definition of a submitting and executing carrier. Frontier argues that it is a "executing carrier" whose obligations are specified in 47 C.F.R. § 64.1100(a)(2) (1999), as follows:

"An executing carrier shall not verify the submission of a change in a subscriber's selection of a provider of telecommunications service received from a submitting carrier. For an executing carrier, compliance with procedures prescribed in this part shall be defined as prompt execution, without any unreasonable delay, of changes that have been verified by a submitting carrier."

Under this restriction, Frontier contends it may not request proof of consumer consent and incur unnecessary delay of the change order. This is contended to run directly counter to the application of K.S.A. 2000 Supp. 50-6,103, requiring state law to be preempted.

This entire argument breaks down immediately in that the change which was made here was never verified, authorized, asked for, or requested, or in any manner involved the consumer until the results of the change order became apparent. This is also sup-

ported by the 1998 FCC order, FCC 98-334, upon which the regulations in question were based, where the FCC stated:

"We conclude that the executing carrier should be the carrier who has actual physical responsibility for making the change to the subscriber's service, rather than a carrier that is merely forwarding a carrier change request on behalf of a subscriber." *Second Report and Order and Further Notice of Proposed Rulemaking,* 14 FCC Rcd 1508, 1565 (1999).

Frontier did not have physical responsibility of changing Doty's carrier; the local exchange carrier (Southwestern Bell) performed that task.

To allow Frontier to participate and profit through its contractual agreements with IEC—yet insulate itself from any responsibility—flies in the face of the intent of the Kansas Legislature when it enacted 50-6,103.

Doty argues that K.S.A. 2000 Supp. 50-6,103 does not impose liability based on label or classification but, rather, on actions. He argues that since Frontier is actually a submitting carrier rather than an executing carrier, it is not prohibited from verifying the change order request. He convincingly argues that Frontier submitted the totally invalid change order to his telecommunications carrier.

While the result we reach is in no manner based on or grounded in the contract between Frontier and IEC, that contract does contain an indemnification provision that provides: "Purchaser shall defend and indemnify Frontier against any and all claims, including without limitation, any End-User, LEC or regulatory agency claims arising from or related to Purchaser's failure to use or provide valid LOAs." (LOA is the abbreviation for Letter of Agency, the document which is required to be executed by a consumer authorizing the change of the consumer's long-distance carrier.) It thus appears that Frontier anticipated the exact type of a claim made in this case. We do not, however, give credence to this provision as being determinative of the preemption question in any way.

While we do not minimize the parties' attempt to find persuasive authority in the numerous cases cited by both sides, we do not believe any of them to be determinative. Many are rate cases, oth-

ers involve actions of state regulatory agencies, and none is sufficiently on point to be relied upon for our ultimate decision.

When the purpose of the 1996 Federal Telecommunications Act is reviewed from a reading of 47 U.S.C. § 151, (1994 ed., Supp V. 2000), with its broad language of making available a "rapid, efficient, Nationwide, and world-wide wire and radio communications service," there is still no showing that any attempt at preemption was apparent. And, as has been often said: "In the absence of express preemption, there is a strong presumption that Congress did not intend to displace state law. *Maryland v. Louisiana*, 451 U.S. 725, 726, [68 L. Ed. 2d 576, 101 S. Ct. 2114], 2118 (1981); *Palmer v. Liggett Group, Inc.*, 633 F.Supp. [1171] at 1173; see also *Silkwood* [*v. Kerr-McGee Corp.*], 464 U.S. [238] at 251, [78 L. Ed. 2d 883] 104 S. Ct. [615] at 623." *Graham v. Wyeth Laboratories*, 666 F.Supp. 1483, 1489 (D. Kan. 1987). While some interference is unavoidable, Kansas law does not prevent the achievement of Congress' goals, and does not appear to be in direct conflict with them. As previously held by this court regarding preemption: "We said that the conflict between the two laws must be positive and direct in order to make coexistence of the two laws an impossibility. It is necessary that the state law in its application to the same field contravene federal public policy or cause a different result or consequence. [*Elkins v. Showcase, Inc.*] 237 Kan. [720] at 727, [704 P.2d 977 (1985)]; see *Watkins v. H.O. Croley Granary*, 555 F.Supp. 458, 460 (N.D. Ga. 1982)." *Hartford Accident & Indem. Co. v. American Red Ball Transit Co.* 262 Kan. 570, 576, 938 P.2d 1281, *cert. denied* 522 U.S. 951 (1997).

It can be argued that to permit a statutory fine of $5,000 to $20,000 in addition to the punishment for slamming in the federal regulations could have a chilling effect on the "rapid" execution of personal interexchange carrier change requests and an unreasonable effect on the telecommunications industry. However, the potential profits from widespread slamming and the negative effect on consumers must also be entitled to considerable consideration.

Of interest are the provisions of 47 U.S.C. § 253 (1994 ed., Supp. V. 2000), which preserve in the states the right to protect the interests of consumers, although that savings clause is limited to the

context of state laws which may prohibit carriers from providing telecommunications services:

"Removal of barriers to entry

"(a) In general. No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

"(b) State regulatory authority. Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."

Interestingly, 47 U.S.C. § 253 also provides that if a state has overstepped its bounds, the FCC has the power to require the state to correct its action:

"(d) Preemption. If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency."

Kansas law, if seen as a barrier to a telecommunication carrier's ability to enter or stay in the market, would appear to fall under the safe harbor of protecting the rights of Kansas consumers. Certainly, lawful action by any "supplier" of telecommunications services is not prohibited or restrained by K.S.A. 2000 Supp. 50-6,103.

We conclude that federal preemption did not exist under all of the facts of this case and that the trial court's decision is correct.

Doty's counsel has properly submitted a motion pursuant to Supreme Court Rule 7.07(b)(2000 Kan. Ct. R. Annot. 52) for attorney fees and costs on appeal in the amount of $3,348.95, which under our holding affirming the trial court is granted. On remand, this amount shall be included as additional attorney fees allowed under K.S.A. 2000 Supp. 50-6,103.

Affirmed and remanded with instructions.