No. 118,095

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BNSF RAILWAY COMPANY,
*Appellant*.

SYLLABUS BY THE COURT

1.

The Supremacy Clause of Article VI of the United States Constitution, which establishes the doctrine of federal preemption, invalidates state laws that interfere with, or are contrary to, federal law.

2.

Because federal preemption involves an interpretation of law, appellate courts have an unlimited standard of review.

3.

Federal preemption is ultimately a question of congressional intent. Express preemption occurs when Congress makes its intent known through explicit statutory language. Implied preemption occurs when Congress does not expressly preempt state law, but its intent to do so can be inferred from a statutory or regulatory scheme.

4.

When Congress fails to expressly preempt state law, there is a strong presumption that it did not intend to displace state law. However, the presumption against preemption

1

is not triggered when the State regulates in an area where there has been a history of significant federal presence.

5.

Historically, federal regulation of railroads has been extensive, pervasive, and comprehensive.

6.

The Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 10101 et seq. (2016), created the Surface Transportation Board to ensure the development and continuation of a sound rail transportation system in the United States. 49 U.S.C. § 10501(a)(1) (2016).

7.

In enacting the ICCTA, Congress granted the Surface Transportation Board exclusive jurisdiction over the construction, acquisition, operation, abandonment, or discontinuance of railroad tracks and facilities. Furthermore, Congress expressly stated that the remedies with respect to regulation of rail transportation set forth in the ICCTA are exclusive and preempt other remedies provided under federal or state law. 49 U.S.C. § 10501(b).

8.

The ICCTA preempts all state or local laws that may reasonably be said to have the effect of managing or governing the operations of a rail carrier. Even so, state and local authorities may continue to exercise traditional police powers to protect public health and safety so long as the application of such laws or regulations have only a remote or incidental effect on rail transportation.

9.

K.S.A. 66-273 prohibits railroad companies and corporations operating a railroad in Kansas from allowing trains to stand upon any public roadway near any incorporated or unincorporated city or town to exceed 10 minutes at any one time without leaving an opening on the roadway of at least 30 feet in width.

10.

Because K.S.A. 66-273 specifically targets railroad carriers and has an effect on railroad operations that is more than remote or incidental, it infringes upon the exclusive jurisdiction of the Surface Transportation Board.

Appeal from Chase District Court; DOUGLAS P. JONES, magistrate judge. Opinion filed November 2, 2018. Reversed.

*Marianne M. Auld* and *Jody S. Sanders*, of Kelly Hart & Hallman LLP, of Fort Worth, Texas, and *Noah K. Garcia*, of Knight Nicastro, LLC, of Kansas City, Missouri, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., MCANANY, J., and BURGESS, S.J.:

BRUNS, J.: BNSF Railway Company (BNSF) appeals its conviction for violating K.S.A. 66-273. This statute prohibits a railroad company from allowing its trains to stand upon a railroad crossing for more than 10 minutes without leaving an opening at least 30 feet wide on the public roadway. Following a bench trial, the district court found that a BNSF train blocked two crossings in Chase County for approximately four hours. Because we find that the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101 et seq. (2016), preempts K.S.A. 66-273, we reverse BNSF's conviction as a matter of law.

FACTS

BNSF operates a rail line through Chase County on which it operates freight trains. Both BNSF and Union Pacific operate trains on the track. Although BNSF does not have a rail yard or terminal in Chase County, it does have a side track adjacent to the main track near Bazaar. The side track is used to change crews, to perform maintenance, to allow other trains to pass, and for various other reasons.

There are two grade crossings—located within several hundred feet of each other —where the main line and side tracks intersect with public roadways northeast of Bazaar. One is at the intersection with Norton Creek Road and the other is at the intersection with T Road. According to BNSF, it built the two grade crossings so closely together to minimize inconvenience for local residents whose property is only accessible by crossing the railroad tracks. Yet, as BNSF acknowledges, trains occasionally block both railroad crossings. This case involves one of those occasions.

Shortly after 6 a.m. on the morning of December 19, 2016, the Chase County Sheriff's Department received a call reporting a stopped train blocking both of the railroad crossings. Sheriff Richard Dorneker arrived at the scene around 8 a.m. He spoke to a BNSF employee who he saw walking up and down the tracks. Although the BNSF employee told Sheriff Dorneker that he had to check the train, he evidently offered no additional information regarding why the train was stopped.

After assessing the situation, Sheriff Dorneker instructed someone in his office to call BNSF in an attempt to clear the railroad crossings. Although the Sheriff's office apparently placed three phone calls to BNSF, the crossings remained blocked until 9:54 a.m. As a result, Sheriff Dorneker issued BNSF a citation—which listed Engine No. 7220 and Engine No. 8169—for blocking the railroad crossings for four hours and six minutes in violation of K.S.A. 66-273.

Prior to trial, BNSF moved to dismiss the citation. In the motion, BNSF argued that the State had failed to come forward with sufficient evidence for the case to proceed to trial. BNSF also argued that federal law preempts the Kansas statute. The district court heard the motion on March 14, 2017. On April 18, 2017, the district court denied the motion. In its memorandum decision, the district court found that the State had come forward with sufficient evidence to go to trial. In addition, the district court ruled that federal law did not preempt K.S.A. 66-273.

On June 1, 2017, the district court held a bench trial. The State offered the testimony of Sheriff Dorneker and several residents affected by the blocked railroad crossings on the morning of December 19, 2016. Several area residents testified that they missed work that day because the crossings were blocked. Likewise, because of the blocked crossings, service technicians were unable to reach the house of one resident who had no water and was having problems with his heating system. At the close of the State's evidence, BNSF moved for acquittal and the district court took the motion under advisement.

In its defense, BNSF called one of its terminal managers to testify. Through this witness, BNSF introduced evidence regarding a locomotive event recorder for Engine No. 7220. An event recorder records a train's speed, braking, throttle position, location, and other information. Apparently, the event recorder showed that Engine No. 7220 stopped near Bazaar for only 7 minutes and 40 seconds to transfer crews. It also showed that Engine No. 7220 was about 20 miles southeast of Wichita at 9:54 a.m. There was no evidence presented about Engine No. 8169.

The BNSF terminal manager also testified about various alternatives to blocking the railroad crossings that might be available. He testified that it would not be "conducive to business" to run shorter trains on the rail line. He also testified that the train could be "cut" to allow motor vehicles to use the roadway but suggested that this was not a

practical solution. He explained that someone would have to walk to the place where the train could uncoupled—which could be more than a mile away from the engine—and then go through multiple steps to uncouple the cars. He also explained the process of recoupling the cars, which includes federally mandated air brake testing, could take as much as two hours to complete.

In rebuttal, the State recalled Sheriff Dorneker as a witness. He acknowledged that he might have been mistaken about the engine numbers. At the conclusion of the evidence, BNSF again moved for acquittal based on the lack of identification as well as on federal preemption. After hearing the closing arguments presented by counsel, the district court took the case under advisement.

On July 7, 2017, the district court entered a journal entry denying BNSF's motions and finding it guilty of violating K.S.A. 66-273. Specifically, the district court found that a BNSF train blocked the crossings for 3 hours and 52 minutes. Accordingly, it ordered BNSF to pay a fine of $4,200 fine plus court costs.

ANALYSIS

*Contentions of the Parties*

On appeal, BNSF contends that we should reverse its conviction for violating K.S.A. 66-273 for three reasons. First, BNSF argues that the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10101 et seq., preempts K.S.A. 66-273. Second, BNSF argues that the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20101 et seq. (2016), preempts the K.S.A. 66-273. Third, BNSF argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that it was guilty of violating K.S.A. 66-273.

6

In response, the State contends that we should affirm BNSF's conviction. The State argues that federal law does not preempt K.S.A. 66-273. Instead, the State maintains that the Kansas antiblocking statute is a valid exercise of traditional police powers to protect public health and safety. The State also argues that it presented sufficient evidence at trial to prove beyond a reasonable doubt that BNSF violated K.S.A. 66-273.

*Federal Preemption of State Law*

The Supremacy Clause of Article VI of the United States Constitution establishes the doctrine of federal preemption:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

Consequently, "the Supremacy Clause invalidates state laws that interfere with, or are contrary to, federal law." *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 294, 255 P.3d 1186 (2011). Whether federal preemption exists and the scope of the preemption are questions of congressional intent. See *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992). In determining whether Congress intended for federal preemption to apply in a given case, we must first look to the "language of the preemption statute and the 'statutory framework' surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996). Because federal preemption involves an interpretation of law, our review of the issue is unlimited. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, Syl. ¶ 18, 296 P.3d 1106 (2013).

7

Federal preemption can be either express or implied. *Board of Miami County Comm'rs*, 292 Kan. at 294. Express preemption occurs "when Congress makes its intent known through explicit statutory language." 292 Kan. at 295. Implied preemption happens "when congress does not expressly preempt state law, but its intent to do so can be inferred from a statutory or regulatory scheme." 292 Kan. at 296. The Kansas Supreme Court has also recognized several analytical subcategories of implied preemption:

"Broadly speaking, a preemption analysis divides into two principal categories: express and implied preemption. Implied preemption is further divided into two analytical subcategories: field preemption and conflict preemption. Then, yet a third strata of analytical subcategories is used when examining claims of conflict preemption: per se conflict and obstacle preemption. [Citations omitted.] Even though it is analytically helpful to consider the relationship of these categories, it must be remembered that these analytical categories are not 'rigidly distinct.' *English*, 496 U.S. at 79 n.5. For example, 'field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.' *English*, 496 U.S. at 79 n.5." *Board of Miami County Comm'rs*, 292 Kan. at 294-95.

Furthermore, our Supreme Court has enumerated several ways that federal law can preempt state laws:

"Absent an express statement by Congress that state law is preempted preemption occurs where there is an actual conflict between federal and state law; where compliance with both federal and state law is, in effect, physically impossible; where Congress has occupied the entire field of regulation and leaves no room for states to supplement federal law; or when the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress." *Doty v. Frontier Communications Inc.*, 272 Kan. 880, Syl. ¶ 4, 36 P.3d 250 (2001).

In evaluating the scope of federal preemption in a particular case, "'[t]he purpose of Congress is the ultimate touchstone.'" *Medtronic, Inc.*, 518 U.S. at 485 (quoting *Retail*

8

*Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 11 L. Ed. 2d 179 [1963]). When Congress fails to expressly preempt state law, "'there is a strong presumption that Congress did not intend to displace state law.'" *Doty*, 272 Kan. 880, Syl. ¶ 5. This presumption is based on the principle of federalism. This principle—which is "central to the constitutional design"—recognizes "that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). Because states are "independent sovereigns in our federal system, [courts] have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic, Inc.*, 518 U.S. at 485.

The presumption against preemption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 109, 120 S. Ct. 1135, 146 L. Ed. 2d 69 (2000). In other words, "the presumption does not apply if the area of regulation is one where the interests at stake are 'uniquely federal' in nature." *Board of Miami County Comm'rs*, 292 Kan. at 296 (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 108 S. Ct. 2510, 101 L. Ed. 2d 442 [1988]). As our Supreme Court has recognized, "the federal regulation of railroads . . . is both pervasive and comprehensive." *Board of Miami County Comm'rs*, 292 Kan. at 297 (citing *Chicago & N.W. Tr. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318, 101 S. Ct. 1124, 67 L. Ed. 2d 258 [1981]); see also *Fayard v. Northeast Vehicle Servs., LLC*, 533 F.3d 42, 46 (1st Cir. 2008) ("Historically, federal regulation of railroads has been extensive.").

*Interstate Commerce Commission Termination Act*

The Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 § U.S.C. 10101 et seq., abolished the Interstate Commerce Commission, which had been in existence since 1887. The ICCTA also created the Surface Transportation Board (STB)

to regulate rail transportation in the United States. 49 U.S.C. § 10501(a)(1) (2016). "Congress has delegated to the [STB] exclusive jurisdiction to regulate 'transportation by rail carriers' and 'the construction, acquisition, operation, abandonment, or discontinuance' of rail facilities . . . with the instruction that the agency 'ensure the development and continuation of a sound rail transportation system' [citation omitted]." *City of South Bend, IN v. Surface Transp. Bd.*, 566 F.3d 1166, 1168 (D.C. Cir. 2009).

The ICCTA expressly provides that the STB has jurisdiction over:

"(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

"(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, *is exclusive*." (Emphasis added.) 49 U.S.C. § 10501(b).

The ICCTA also contains an express preemption provision, which states:

"Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation *are exclusive and preempt the remedies provided under Federal or State law*." (Emphasis added.) 49 U.S.C. § 10501(b).

For these reasons, we found in *Wichita Terminal Ass'n v. F.Y.G. Investments, Inc.*, 48 Kan. App. 2d 1071, 1081, 305 P.3d 13 (2013):

"[I]t is apparent 'that a state or local law that permits a non-federal entity to restrict or prohibit the operations of a rail carrier is preempted under the ICCTA.' *Norfolk Southern Ry Co. v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010). But states and municipalities 'may exercise traditional police powers . . . to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with

10

reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions.' *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005). Therefore, the ICCTA 'preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.' *Adrian & Blissfield R. Co. v. Village of Blissfield*, 550 F.3d 533, 539 (6th Cir. 2008)."

"[S]tate or local statutes or regulations are preempted categorically [by the ICCTA] if they 'have the effect of "managing" or "governing" rail transportation.'" *Delaware v. Surface Transportation Bd.*, 859 F.3d 16, 19 (D.C. Cir. 2017) (quoting *Norfolk S. Ry. Co.*, 608 F.3d at 157). In other words, a categorical preemption analysis focuses on "the act of regulation itself, not the effect of the state regulation in a specific factual situation." *Green Mountain R.R. Corp.*, 404 F.3d at 644; see also *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008) (noting that the categorical preemption analysis focuses on "'the act of regulation itself'" and not on the reasonableness of a particular state statute or regulation). Furthermore, "[s]tate statutes or regulations that are not categorically preempted may still be impermissible if, as applied, they would have the effect of unreasonably burdening or interfering with rail transportation." *Delaware v. Surface Transportation Bd.*, 859 F.3d at 19 (citing *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 414 [5th Cir. 2010]; *Adrian & Blissfield R. Co.*, 550 F.3d at 541).

Notwithstanding, under the principle of federalism, states retain certain traditional police powers over public health and safety concerns. In particular, states continue to have the power to impose "rules of general applicability" that do not target the operation of rail carriers. *Ass'n of American Railroads v. South Coast Air Quality Management Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010); see also *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) ("[F]or a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry."). As the

11

United States Court of Appeals for the Second Circuit has found, the type of statutes or regulations that generally address state concerns include "[e]lectrical, plumbing and fire codes, direct environmental regulations . . . and other generally applicable, non-discriminatory regulations and permit requirements." *Green Mountain R.R. Corp.*, 404 F.3d at 643.

*Application of ICCTA to K.S.A. 66-273*

The statute at the center of this dispute is K.S.A. 66-273, which states:

"Each and every railroad company or any corporation leasing or otherwise operating a railroad in Kansas is hereby *prohibited from allowing its trains, engines or cars to stand upon any public road* within one half mile of any incorporated or unincorporated city or town, station or flag station, *or upon any crossing or street, to exceed ten minutes at any one time* without leaving an opening in the traveled portion of the public road, street or crossing of at least thirty feet in width." (Emphases added.)

Moreover, K.S.A. 66-274 provides:

"Any railroad company or corporation operating a line of railroad in Kansas failing or neglecting to comply with K.S.A. 66-273, and amendments thereto, shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine . . . ."

As the State correctly points out, Kansas has a long history of regulating how long a rail carrier can let its trains, engines, or cars block a public roadway at a railroad or grade crossing. In fact, the forerunners to K.S.A. 66-273 and K.S.A. 66-274 were enacted in 1897. In its present form, K.S.A. 66-273 was enacted in 1923. At no point over the past 121 years has any state or federal court addressed whether federal law preempts K.S.A. 66-273 or its predecessors.

12

In *Denton v. Missouri, K. & T. Ry. Co.*, 90 Kan. 51, 54, 133 P. 558 (1913), the Kansas Supreme Court found that Gen. Stat. 1909, § 7142—a predecessor to K.S.A. 66-273—"was clearly intended to prevent the impeding of traffic, by providing that except for limited periods a strip thirty feet wide should be kept open for travel." Two years later, in *Walker v. Missouri Pac. Ry. Co.*, 95 Kan. 702, 706, 149 P. 677 (1915), our Supreme Court again addressed Section 7142 of the General Statutes of 1909. In doing so, it found that the "statute must be so construed as to permit trains to stop anywhere to prevent accidents." From a review of these cases in light of the plain language of K.S.A. 66-273, it is apparent that the statute—both historically and in its present form—is an attempt by the Kansas Legislature to protect public health and safety.

Nevertheless, K.S.A. 66-273 is *not* a law of general applicability. Rather, as the State recognizes in its brief, K.S.A. 66-273 is a "railroad regulation" that—on its face—applies only to a "railroad company or any corporation leasing or otherwise operating a railroad in Kansas." Although we agree with the State that trains blocking railroad crossings can be a safety hazard, the plain language of K.S.A. 66-273 targets the railroad industry. It specifically prohibits trains, engines, or train cars from blocking a public roadway for more than 10 minutes without leaving an opening of at least 30 feet in width between train cars. For these reasons, we conclude that the ICCTA preempts K.S.A. 66-273 because it has an effect on railroad operations that is more than incidental or remote.

Nearly all of the federal and state courts that have considered the issue of whether the ICCTA preempts state laws regulating how long a train can block a railroad crossing have concluded that they are categorically—or completely—preempted because they specifically target railroad operations. See, e.g., *Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439 (5th Cir. 2001). Similarly, the federal and state courts that have considered whether the ICCTA preempts civil claims for alleged violations of state antiblocking statutes have also found them to be preempted. See, e.g., *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796 (5th Cir. 2011) ("Mississippi's antiblocking statute directly attempts to

13

manage KCSR's switching operations, including KCSR's decisions as to train speed, length, and scheduling.").

*Friberg v. Kansas City S. Ry. Co.* was one the first cases to address preemption in the context of an antiblocking statute. In its opinion, the United States Court of Appeals for the Fifth Circuit held that the ICCTA preempted a Texas law that prohibited trains from blocking streets or railroad crossings for more than five minutes. 267 F.3d at 441, n.2, 444. The Fifth Circuit found that regulating the time a train could occupy a rail crossing affects things such as train speed, length, and scheduling. 267 F.3d at 443. It also found that decisions as to train speed, length, and scheduling were economic decisions. 267 F.3d at 444. The Fifth Circuit ultimately concluded that the ICCTA preempted the Texas antiblocking law. 267 F.3d at 444.

Since 2001, nearly all of the federal and state courts that have considered the issue have continued to follow in the same line of reasoning used by the *Friberg* court. See, e.g., *CSX Transp., Inc. v. Williams*, No. 3:16CV2242, 2017 WL 1544958, at *2 (N.D. Ohio 2017) (unpublished opinion) (holding that the ICCTA preempted the Ohio statute "because it purports to regulate rail transportation by dictating how railroads conduct their operations at crossings"); *People v. Burlington N. Santa Fe R.R.*, 209 Cal. App. 4th 1513, 148 Cal. Rptr. 3d 243 (2012) ("The State of California, by regulating the time a stopped train can occupy a public rail crossing, has necessarily and directly attempted to manage railroad operations."); *Burlington N. & Santa Fe Ry. Co. v. Dep't of Transp.*, 227 Or. App. 468, 206 P.3d 261 (2009) (holding that Oregon's antiblocking regulation was "by its express terms, an 'operating rule' and a 'regulation of rail transportation'").

The State asks us to adopt the contrary view taken by the Indiana Court of Appeals in *State v. Norfolk S. Ry. Co.*, 84 N.E.3d 1230 (Ind. App. 2017). This was the only case in the nation to hold that the ICCTA did not preempt a state antiblocking law. With minimal analysis, the Indiana Court of Appeals concluded that neither the ICCTA nor the FRSA

preempt Indiana's antiblocking statute. *Norfolk S. Ry. Co.*, 84 N.E.3d at 1236-38. After the parties had filed their briefs in this appeal, the Indiana Supreme Court agreed to review the case. See *State v. Norfolk S. Ry. Co.*, 98 N.E.3d 70 (April 12, 2018).

Recently, the Indiana Supreme Court handed down its opinion in *State v. Norfolk S. Ry. Co.*, 107 N.E.3d 468 (Ind. 2018). In its opinion, the Indiana Supreme Court held that the ICCTA expressly and categorically preempts the Indiana antiblocking statute because it regulates rail transportation. 107 N.E.3d at 470. In reaching this conclusion, the Indiana Supreme Court joined every other federal and state court that has examined the ICCTA's preemptive effect on state antiblocking statutes.

Specifically, the Indiana Supreme Court found:

"[S]ince Indiana's blocked-crossing statute is a remedy that directly regulates rail operations, the ICCTA categorically preempts it. *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 894-95 (7th Cir. 2017) ('Categorical preemption occurs when a state . . . action is preempted on its face,' including when states 'deny a railroad the ability to conduct some part of its operations.'). This holding mirrors those of several other jurisdictions addressing blocked-crossing preemption under the ICCTA. *See Elam*, 635 F.3d 796; *Friberg*, 267 F.3d 439; *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836 (E.D. Ky. 2004); *People v. Burlington N. Santa Fe R.R.*, 209 Cal. App. 4th 1513, 148 Cal. Rptr. 3d 243 (2012); *Burlington N. & Santa Fe Ry. v. Dep't of Transp.*, 206 P.3d 261 (Or. Ct. App. 2009); *City of Seattle v. Burlington N. R.R.*, 145 Wash. 2d 661, 41 P.3d 1169 (2002) (en banc)." 107 N.E.3d at 477.

Much like this case, the State of Indiana argued that the antiblocking statute was "not preempted because the ICCTA's core concern is economic regulation." *Norfolk S. Ry. Co.*, 107 N.E.3d at 476. In finding that federal preemption under the ICCTA is not limited only to economic regulations, the Indiana Supreme Court reasoned:

"First, the line between economic and non-economic regulations 'begins to blur' in many cases, including this one. *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1031 (9th Cir. 1998). Environmental, traffic, or safety regulations 'amount to "economic regulation,"' *Eel River*, 399 P.3d at 62, when they stymie railroads' key operational choices—choices they would otherwise make for economic reasons. *See id.* at 62-64. So the blocked-crossing statute's effects on train length, speed, and scheduling are indistinguishable from economic regulations. *See Friberg*, 267 F.3d at 444.

"Second—and more fundamentally—even if an economic focus were in Congress's mind, it is not in the ICCTA's text. *See* 49 U.S.C. § 10501(b). Plain text, when we have it, 'begins and ends our analysis.' *Puerto Rico*, 136 S. Ct. at 1946. Here the preemption provision plainly does not limit preemption to economic regulations. 49 U.S.C. § 10501(b); *see Friberg*, 267 F.3d at 444 (noting 'the all-encompassing language of the ICCTA's preemption clause')." *Norfolk S. Ry. Co.*, 107 N.E.3d at 476.

As we recognized in *Wichita Terminal Ass'n*, 48 Kan. App. 2d at 1079, the ICCTA was enacted "'to reflect the direct and complete preemption of state economic regulation of railroads.' H.R. Rep. 104-311, at 95-96 (1995)." However, the ICCTA "does not preempt only explicit economic regulation." *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007). Instead, the ICCTA "preempts all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'" 500 F.3d at 252 (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 [11th Cir. 2001]).

We note that in *City of Norton v. Lowden*, 84 F.2d 663 (10th Cir. 1936), the United States Court of Appeals for the Tenth Circuit cited the current version of K.S.A. 66-273 in a case involving an effort by the City of Norton to open a street at grade across the yards of the Rock Island Railway. Although the Tenth Circuit did not address preemption, it recognized that when a train is required to uncouple at a grade crossing, there is a resulting loss of time, disruption of schedules, and delays. 84 F.2d at 666.

16

While such things may be difficult to value, they have a direct impact on railroad operations.

Similarly, in *CSX Transp., Inc. v. City of Plymouth*, 92 F. Supp. 2d 643 (E.D. Mich. 2000), *aff'd* 283 F.3d 812 (2002), the United States District Court for the District of Eastern Michigan identified several factors that may also have an economic impact on railroad companies in complying with the Michigan antiblocking statutes. These factors include such things as a train's length, the performance of federally mandated air brake tests, as well as the coupling and uncoupling of cars. 92 F. Supp. 2d at 646. Ultimately, the court held that the ICCTA preempts the Michigan statute because compliance with antiblocking statutes would have an economic impact on the operation of railroad companies. 92 F. Supp. 2d at 658-59. Furthermore, the court recognized that "if there is to be a limit on the amount of time that a train is permitted to block a crossing, it must come from the federal government." 92 F. Supp. 2d at 659.

Likewise, in *Canadian Nat'l Ry. Co. v. City of Des Plaines*, No. 1-04-2479, 2006 WL 345095 (Ill. App. 2006) (unpublished opinion), the Illinois Court of Appeals held that the ICCTA preempted a city ordinance that prohibited a stopped train from blocking an intersection for more than 10 minutes. As in this case, the City argued "that the ordinance [was] a valid use of the City's police power to protect the health and safety of its citizens and therefore is not preempted by the ICCTA." 2006 WL 345095, at *2. Canadian National argued that compliance with the city ordinance may result in the uncoupling of train cars to allow motor vehicles passage at railroad crossings. It also noted that even if the train cars were uncoupled, it would take longer than 10 minutes to put the train back together and undergo air brake testing required by federal law. The Illinois Court of Appeals held that the ICCTA preempts the City's ordinance because it had a significant effect on the operation of railroad companies. 2006 WL 345095, at *3.

The State suggests that K.S.A. 66-273 does not have "the direct effect of managing or governing rail transportation" because it only applies to standing or stopped trains. From a review of the cases cited above as well as from a review of the record in this case, we find several examples of reasons that a train may be required to stop. These reasons include such things as allowing another train to pass, responding to an emergency, switching out crews, performing maintenance, and coupling or uncoupling a train car. Unfortunately, trains sometimes block railroad crossings while such operations take place. See *Burlington N. & Santa Fe Ry. Co.*, 227 Or. App. at 474. So we find that regulating how long a train may stop has both economic and practical effects that are not "merely incidental" to the operation of rail carriers. See *Elam*, 635 F.3d at 807.

While it is true that the ICCTA does not expressly address the blocking of railroad crossings, it does preempt "all state or local laws that may reasonably be said to have the effect of managing or governing the operations of a rail carrier." *Wichita Terminal Ass'n*, 48 Kan. App. 2d 1071, Syl. ¶ 6. Although the State may continue to exercise traditional police powers to protect public health and safety, it can only do so as "long as the application of such laws or regulations has only a remote or incidental effect on rail transportation." 48 Kan. App. 2d 1071, Syl. ¶ 7. In other words, such a law "must address state concerns generally, without targeting the operation of the railroad industry." *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 254.

Although K.S.A. 66-273 serves an admirable purpose, a review of the plain language of the statute reveals that it is not a law that applies generally to the public. Instead, it specifically targets the operation of rail carriers by regulating the time trains may occupy railroad crossings without moving or uncoupling. The statute also has more than a remote or incidental effect on rail transportation. See *Franks Inv. Co. LLC*, 593 F.3d at 411 ("mandat[ing] when trains can use tracks and stop on them is attempting to manage or govern rail transportation in a direct way"). Thus, K.S.A. 66-273 infringes on

18

the exclusive jurisdiction of the STB to regulate the rail transportation system in the United States.

CONCLUSION

We, therefore, conclude that the ICCTA preempts K.S.A. 66-273 and that BNSF's conviction should be reversed as a matter of law. Because of this decision, we will not address the merits of BNSF's contention that the FRSA also preempts K.S.A. 66-273. Likewise, we will not address the merits of BNSF's contention that there was insufficient evidence presented at trial upon which it could have been found guilty of violating K.S.A. 66-273 beyond a reasonable doubt.

Reversed.